PEDRO T. BORJA, ) APPEAL NO. 89-010
 ) CIVIL ACTION NO. 88-394
 Plaintiff/Appellant, )
 )
vs. ) OPINION
 )
WESLEY GOODMAN and )
YOUNIS ARTS STUDIO, INC., )
 )
 Defendants/Appellees.)
_____)

Argued and Submitted on December 20, 1989.

Counsel for Plaintiff/Appellant: Theodore W. Gebhardt, Esq.
 Salas, Gebhardt & Manibusan
 P.O. Box 1309
 Saipan, MP 96950

Counsel for Defendants/Appellees: Bruce L. Mailman, Esq.
 White, Novo-Gradac & Manglona
 P.O. Box 222 CHRB
 Saipan, MP 96950

 BEFORE: DELA CRUZ, Chief Justice; VILLAGOMEZ, Justice; and

HILLBLOM, Special Judge.

 We hereby AFFIRM the trial court order granting summary

judgment in favor of the defendants. Because each of us reach this

result differently, we each write separate concurring opinions affirming the trial court.

Entered this __26__ day of June, 1990.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
LARRY L. HILLBLOM, Special Judge

DELA CRUZ, Chief Justice, concurring on the judgment:

This is an appeal by the plaintiff Pedro T. Borja ("Borja") from an order granting summary judgment in favor of defendants in a defamation action.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On May 9, 1988, the plaintiff filed a defamation action against newspaper reporter Wesley Goodman ("Goodman") and his employer Younis Arts Studio, Inc. ("Younis"), which publishes the Marianas Variety News and Views ("Marianas Variety"), a local newspaper. The complaint alleged that defendants wilfully, wrongfully, and maliciously published in the Marianas Variety, March 29, 1988 edition, a false, libelous, defamatory, and

227

unprivileged article with the intent to injure, disgrace, and defame the plaintiff.

At issue is that part of the article which read:

"Pedro T. Borja was pronounced guilty of sexual abuse of a child in a March 22 ruling by Judge Ramon Villagomez, according to court records. The documents say the child is a girl."

The complaint alleged that such statement conveyed to the readers of the newspaper that plaintiff was the person convicted and sentenced, which was false.

The complaint also alleged that the failure to state in the article the residence of the Pedro T. Borja who was convicted and sentenced was intentional and malicious and, as a result, the plaintiff (who has the same name) was subjected to public scandal and disgrace and suffered injury to his name and reputation.

The defendants admitted publishing the article but otherwise denied liability for libel. They asserted, as affirmative defense, that the article at issue was a report of an official action or proceeding, that it was accurate and complete or a fair abridgement of the occurrence reported and, therefore, privileged. Alternatively, defendants asserted that, even if the publication were not privileged, they did not know that it was false or that it defamed the plaintiff, nor did they act with reckless disregard as to such matters, or that they acted negligently in failing to ascertain such matters.

On April 28, 1989, the defendants moved for summary judgment, pursuant to Rule 56(b), Com.R.Civ.P. They contended that the

article is privileged since it is a report of an official proceeding; that they did not abuse the privilege of fair reporting; and that there was no genuine issue of material fact as to whether (a) defendants abused the privilege of fair reporting, (b) defendants were at fault, or (c) the article in question was false.

On May 31, 1989, the trial court granted defendants' motion for summary judgment. It determined that the news article in question, even if defamatory as to the plaintiff, was privileged as a report of an official proceeding and there was no abuse of the privilege.

## II. ISSUES PRESENTED

On appeal, we are asked to review three issues. The first is whether the news article in question was in fact accurate and complete or was a fair abridgement of the occurrence reported. The next (which is really the same as the first) is whether the article was instead an incomplete, inaccurate and fragmentary account of the event reported. The last issue is whether the lower court erred, as a matter of law, by "failing to recognize the special circumstances of living in the Northern Mariana Islands and failing to examine the defendants' duty [towards the plaintiff] in light of those special circumstances."

## III. STANDARD OF REVIEW

We review <u>de novo</u> a trial court order granting summary

judgment. <u>Cabrera v. Heirs of Pilar De Castro, et al.</u>, 89-018 (NMI June 7, 1989, and <u>Government of the Northern Mariana Islands v. Micronesian Insurance Underwriters, Inc.</u>, 2 CR 1164, 1170 (D.NMI,App.Div., 1987). Our review is limited to a determination of whether there is a genuine issue of material fact and, if there is none, whether the trial court correctly applied the substantive law. <u>Manglona v. Camacho</u>, 1 CR 820, 823 (D.NMI,App.Div., 1983).

## IV. ANALYSIS

The facts show that a Pedro T. Borja (not the plaintiff) was convicted of sexual abuse of a child on February 5, 1988. Commonwealth Trial Court Criminal Case No. 87-205. This person was subsequently sentenced by the Court on March 22, 1988. The article at issue in this appeal was published by defendants on March 29, 1988. Thereafter, defendants published a clarification in its April 22, 1988 issue that "[t]he Pedro T. Borja, 36 of Chalan Kiya, currently serving a sentence for sexual abuse of a child is NOT the Pedro T. Borja, (no age available) of As Teo."

Discovery was undertaken by both parties, after which a summary judgment motion was filed by defendants. The motion was grounded on defendants' "Statement of Undisputed Facts," their supporting memorandum of points and authorities, certain exhibits, and the records, files, and pleadings in the case.

The facts, which defendants assert were not disputed, are:

1. That the article at issue was published by the Marianas Variety on March 29, 1988.

230

2. That on April 22, 1988, the Marianas Variety published a clarification as to the person who was in fact convicted and sentenced.

3. That defendant Goodman obtained the information for the March 29, 1988 article in question from the court file in Criminal Case No. 87-205, and the court's sentencing order in such file.

4. That prior to Goodman's review of the court file, Goodman was not aware of the events described in the case and later reported on by him. Neither did the defendants know of plaintiff until after the March 22, 1988 article was published.

A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Com.R.Civ.Pro.; Anderson v. Liberty Lobby Inc., 477 US 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In order to overcome a motion for summary judgment, a non-moving party must show that there are genuine factual issues which can be resolved only by a trier of fact because they may reasonably be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 106 S.Ct., at 2511.

A review of the pleadings, the various exhibits, and the depositions taken show that there is no genuine issue of material fact for purposes of determining whether the article at issue is privileged and whether the privilege was abused by defendants.

Goodman, a reporter for the Marianas Variety, reviewed the

231

case file of the Commonwealth Trial Court in Criminal Case No. 87-205, and based his report thereon. He reported that a Pedro T. Borja was pronounced guilty of sexual abuse of a child. Subsequently, he learned that the plaintiff has a name identical to the person sentenced and the Marianas Variety soon thereafter issued a clarification.

The trial court determined below that since there is no defamation statute in the Commonwealth the rules of the common law as expressed in the Restatements of the Law are applicable. 7 CMC § 3401.[1] I agree that there is no defamation statute in the Commonwealth. Further, I am not aware of any customary law on defamation.

The complaint was grounded on the common law tort of defamation. Liability for defamation, under the Restatement (Second) of Torts, § 558, requires the following factors:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

---

[1] 7 CMC § 3401 reads:

In all proceedings, the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute and, to the extent not so expressed as generally understood and applied in the United States, shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary; provided that no person shall be subject to criminal prosecution except under the written law of the Commonwealth.

232

(d) either actionability of the statement
 irrespective of special harm or the existence
 of special harm caused by the publication.

All four factors must be present to establish liability for defamation. If one is missing, there would be no liability.

As to the first factor, I agree with the trial court that the article at issue was false and defamatory when applied to the plaintiff who has the same name as the person who was criminally convicted. A communication (i.e. statement) is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Restatement (Second) of Torts, § 559.

I also agree with the trial court that truth of a defamatory statement bars recovery for defamation. Id., § 581A. Thus, as to the Pedro T. Borja convicted, the article would be true and the publisher, if sued by him, would have no liability. As to the plaintiff Pedro T. Borja, who has the same name as the person convicted, such article would be false and defamatory, and would create liability against defendants, assuming the other three factors are established.

The second factor required to establish liability for the common law tort of defamation is that the publication be unprivileged. If it is privileged, then there is no liability under common law defamation because all of the four (4) factors required to establish liability under § 558 must be satisfied by

233

the plaintiff. Since the defendants' motion for summary judgment is based on the absence of this factor, the plaintiff must come forward and show that a genuine issue of fact exists on the question of whether the publication is privileged.

The defendants' motion for summary judgment rested on their assertion that there is no genuine issue of material fact that the news article at issue was based on an official action or proceeding which deals with a matter of public concern, and that such report was accurate and complete or was a fair abridgement of the occurrence report. Restatement (Second) of Torts, § 611.[2] They argue, therefore, that the defense of privilege, even if the statement is false and defamatory as to the plaintiff, is undisputed and bars liability.

An official proceeding, for purposes of the § 611 conditional privilege defense, includes proceedings before any court. Id., § 611, comment d. There is no factual dispute that the news report at issue was based on the Commonwealth Trial Court's sentencing order. Borja argues, however, that the report, although based on an official court proceeding, was not complete and accurate because the reference to the convicted Pedro T. Borja did not include his address, so as to distinguish him from the plaintiff. Such

---

[2] Restatement (Second of Torts § 611 reads:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence report.

234

failure, he asserts, erases the privilege and the question as to whether the report, even if based on official action or proceeding, was complete or not is one for the trier of fact to determine.

The defendants countered that assertion by arguing that the article, even if not exactly accurate and complete, is a fair abridgement of the court's sentencing proceeding, and the question of whether it is a fair abridgement of such proceeding is one of law for the court to decide. I agree.

I note that the § 611 privilege is conditional, and not absolute. This means that even if the report is based on an official proceeding, such as the present, the person reporting has an obligation to ensure that the report is either accurate and complete or that it is a fair abridgement of the occurrence reported. Such reporting immunity is "forfeited if the publisher of the report steps out of the scope of the privilege or abuses the 'occasion'. This can be done by exaggerated additions, or embellishment to the account. Furthermore, this qualified privileged may be lost if the defamatory material is published solely for the purpose of causing harm to the person defamed". Williams v. WCAU-TV, 555 F.Supp. 198, 202 (E.D.PA., 1983), quoting Sciandra v. Lynett, 409 Pa. 595, 187 A.2d 586, 600 (1962).

The burden of proving abuse of the privilege rests on the plaintiff. Williams, at 202. Further, "it is the duty of the court to declare as a matter of law that no abuse of the 'occasion of privilege' exists where the evidence adduced leads to but one conclusion". Id., at 202 quoting Sciandra, 187 A.2d 592.

235

In comparing the news report at issue in this case and the trial court's sentencing order from which the article was based, I find no evidence in the record which would lead to a conclusion that the privilege was abused by defendants. There is no showing by the plaintiff that the report was published for the purpose of causing harm to the plaintiff.[3] There is no showing that the report exaggerated or embellished the court proceeding. Further, the plaintiff did not sufficiently rebut the fact that the report fairly summarized such proceeding. Those facts, the lack of embellishment or exaggeration and the lack of intent to do harm, were not disputed by the plaintiff. And, where there is no genuine dispute as to material facts, the question of whether a statement is substantially accurate is one of law for the court to decide. Williams, at 203. A statement is substantially accurate if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced. Williams, at 202; Alioto v. Cowles Communications, Inc., 673 F.2d 616 (9th Cir. 1980).

Once defendants have shown that the report is a substantially correct account of the official proceedings, the plaintiff then assumes the burden of showing otherwise. The plaintiff failed to meet this burden by affidavit or otherwise. Rather, he argues that the § 611 privilege should require more identification of the

---

[3] In fact, the defendants prior to publication did not know the plaintiff or that he has a name identical to the person convicted.

236

person convicted by imposing a duty on the publisher to also show that person's address. This way, he asserts, the report would more clearly identify the person convicted and spare those persons having the same name, including the plaintiff, from any ridicule and embarrassment.

If the defendants, prior to publication, were in fact aware that there are other persons having the name "Pedro T. Borja," I might be persuaded that the suggestion to include the address and further identify the subject has merit. But such was not the case here. Further, the § 611 privilege, unless amended to require an address, does not impose a duty to do so.

The plaintiff further argues that, although the sentencing order did not show the criminal defendant's address, the penal summons in the criminal case file did show his address and, therefore, defendants were negligent in not including the address in the published article. The question of negligence, however, is an element for consideration with respect to the third factor required for establishing liability based on defamation under § 558 of the Restatement. Negligence is not a consideration under the second factor, i.e. that the communication is not privileged. All that is required for the § 611 conditional privilege are that (1) the report is based on an official action or proceeding or of a meeting open to the public, (2) that such action, proceeding, or public meeting deals with a matter of public concern, and (3) the report is accurate and complete, or is a fair abridgement of the occurrence reported. Once those three points are established, the

237

privilege attaches and, unless the plaintiff comes forward and shows a factual dispute as to either of those elements, then summary judgment is appropriate.

The thrust of plaintiff's argument on appeal, however, is one seeking a court-created rule that would establish in this jurisdiction a unique exception to the § 611 privilege defense. That exception, as I have noted, would require a publisher, in reporting on official actions or proceedings, to include a subject's address in addition to his name. The problem I have with imposing such duty with respect to reports of official actions and proceedings is that the cause of action upon which the complaint is based is the common law tort of defamation, which allows for a concomitant conditional privilege defense. Any change to the common law rule of defamation, including the available defenses, should come from the legislature. The reason for this is that courts are generally not equipped to address such changes. The wisdom of the general application to the Commonwealth of the rules of the common law (as laid out in the Restatements of the Law), in the absence of written or customary law, is a matter that is ordinarily best left to the legislature. I would agree that there may be occasions when specific applications of certain common law rules would not be appropriate.[4] I am not, however, persuaded that

---

[4] 7 CMC § 3401 which provides for the almost wholesale application of the rules of common law, in the absence of written or customary law, is a broad statute in existence since the days of the Trust Territory Administration. It apparently was a "short-hand" attempt to fill a gap due to the absence of statutory laws in many areas.

the duty appellant urges us to impose on defendants is justifiable in the instant case.

In light of the separate concurrences of my colleagues, I feel compelled to say a few words on the distinction between the § 611 common law conditional privilege and the constitutional privilege arising under the First Amendment to the U.S. Constitution which requires a plaintiff in an action for defamation to show that the defendant, in publishing a false and defamatory statement concerning the plaintiff, was <u>at fault</u> regarding the injurious character of the statement. § 611, comment b. (Emphasis added.) Under the First Amendment privilege, if the plaintiff is a public official or a public figure, he is required to show that the publisher knew of the falsity and defamatory character of the statement or that he acted with reckless disregard toward these aspects of the statement. <u>Restatement (Second) of Torts</u>, § 580A. If the plaintiff is a private person, he must show the existence of fault amounting to at least negligence in regard to the falsity and the defamatory character of the statement. <u>Id.</u>, § 580B.

The constitutional privilege defense, however, is somewhat different from the § 611 common law privilege since the latter specifically applies only to reports based on official actions or proceedings. So long as the report on such actions or proceedings are accurate and complete or is a fair abridgement of the occurrence reported, the report is privileged notwithstanding the constitutional privilege. In contrast, the constitutional

239

privilege defense applies even where a report does not relate to or is not based on official actions or proceedings. For example, if one publishes a false and defamatory statement concerning a private person, such as the plaintiff herein, and such statement is not based on an official action or proceeding, he would be subject to liability if, but only if, he knows that (a) the statement is false and that it defames another, or (b) he acts in reckless disregard of such matters, or (c) he acts negligently in failing to ascertain them. § 580b; Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

In Gertz, where the § 611 privilege was not at issue because the report was not based on an official action or proceeding, the United States Supreme Court held that, with respect to media defamation of private persons where an issue of public interest is involved, the constitutional privilege standard applicable to public officials established under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is not the appropriate standard to apply. Instead, Gertz ruled that the States, so long as they do not impose liability without fault, may define for themselves the appropriate standard of liability for a publisher of defamatory falsehood which injures a private individual and whose substance makes substantial danger to reputation apparent. Gertz, 94 S.Ct., at 3010-3011.

Under Gertz, the burden of a plaintiff, who is a private individual, is more relaxed (in comparison to a public official or public figure) since liability may be established so long as the

publisher is shown to have at least acted negligently in failing to ascertain that a statement is false and defames the plaintiff. In contrast, the standard of liability for public officials, under New York Times Co. v. Sullivan, supra, and for public figures, under Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), is that the publisher, at least, acted with reckless disregard of the falsity of a statement and that it defamed the plaintiff.

Under the constitutional privilege standard, the liability of a publisher whose publication is false and defames a private figure requires a showing of at least negligence.

The § 611 common law privilege, in contrast, is a bit more liberal than the constitutional privilege since the latter requires proof of negligence by a private figure plaintiff before liability attaches, while the §611 privilege rests on whether a report is based on an official action or proceeding and is accurate and complete or is a fair abridgement of the occurrence reported. The question of fault, i.e. negligence, arises only with respect to the third factor needed to establish liability under section 558 of the Restatement (Second) of Torts. Where a report is based on an official action or proceeding, there is no liability once the § 611 conditional privilege is established.

I am not persuaded at this stage that it is wise to disregard the § 611 official reporting privilege which is an element for establishing liability under § 558 of the Restatement (Second) of Torts which forms the basis upon which the plaintiff's cause of

241

action is grounded. Further, the constitutional privilege consideration, i.e. fault amounting to at least negligence, is itself the third factor needed to establish liability under § 558 and, therefore, the First Amendment constitutional privilege is in fact taken into account by the Restatement.

I, therefore, vote to AFFIRM.

VILLAGOMEZ, Justice, concurring:

I concur with the the other justices' opinion regarding the disposition of this appeal--the lower court's order granting summary judgment should be affirmed. I accept their statement of the facts and formulation of the issues presented. Finally, I agree that pursuant to 7 CMC § 3401, § 558 of the Restatement (Second) of Torts (1977)(hereafter "Restatement") provides the basis for a defamation action in the Commonwealth.

However, it is my opinion that Restatement § 611 is not applicable as a defense. Under 7 CMC § 3401, the lower court should have first determined whether any Commonwealth "written law" was applicable. For the purposes of the statute, "written law" includes the NMI Constitution and NMI statutes, case law, court rules, legislative rules and administrative rules, as well as the Covenant and provisions of the U. S. Constitution, laws and treaties applicable under the Covenant. The Restatements may not be applied as the "rules of decision" if any of these sources are applicable.

In my opinion, Article I, Section 2 of the NMI Constitution

242

provides a defense to defamation.[5] Since that provision is applicable, there is no need to apply the Restatements or any law adopted through section 501 of the Covenant.

The U.S. Supreme Court has dealt with the issue of whether the First Amendment to the U.S. Constitution protects the press against liability for publishing information acquired from government records and specifically court records. The analyses in those cases are instructive and useful in analyzing the issues presented in this case. The provisions of Amendment I to the U.S. Constitution are similar to the provisions of section 2, article I of the NMI Constitution.

The Supreme Court has held that the U.S. Constitution precludes states from imposing civil liability against the press based upon the publication of truthful information contained in official court records open to publc inspection. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 43 L.Ed. 2d 328; 95 S.Ct. 1029 (1975).

The U.S. Supreme Court had earlier held that in order for a press to be liable for defamation, there has to be a showing of some fault on the part of the press. Gertz v. Robert Welch, Inc, 418 U.S. 323, 41 L.Ed. 789, 94 S.Ct. 2997 (1974). Such principle is followed and reiterated in a subsequent case having factual settings closely akin to the case at hand. In Time, Inc. v. Firestone, 424 U.S. 448, 47 L.Ed. 2d 154, 96 S.Ct. 958 (1976), the

---

[5] "No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peacably to assemble and to petition the government for a redress of grievances."

U.S. Supreme Court held that in an action against the press for defamation based on the publication of information acquired from court records, the press is protected by the First Amendment, and there is no liability, unless there is a demonstration of some fault on the part of the press.

Applying the same analysis to the case at hand, I find that based on the undisputed facts before the trial court, there is simply no fault on the part of the defendants when they published the information that was untrue with respect to the plaintiff. The defendants published precisely what the court records stated. The record was truthful and was open to the public.

The suggestion by plaintiff that the court should require the defendants to state the address of the person reported to have been convicted is not practical. It will not solve a situation where two or more people have the same name and live in the same village. For instance, this Court takes judicial notice of the fact that in the Fina Sisu area on Saipan, there live five Ramon Villagomez. Two of them have middle initials "C" and two of them with the middle initial "G".[6]

---

[6] Of the five Ramon Villagomez' four carry the same general family name or "better known as" identification. Within the family, there is a way to identify which Ramon Villagomez is being discussed. However, outside of the family, the giving of the name, address, and family name or "better known as" identification would not be helpful.

244

HILLBLOM, Special Judge, Concurring:

I would affirm the decision of the lower court. For the reasons that follow, I concur with the opinion of Justice Villagomez in his application of 7 CMC § 3401[7] to this case. I also agree with the procedural and factual background statement and the standard of review in the concurring opinion of the Chief Justice. The issues as I see them are as follows:

## I. ISSUES

1. Was the trial court correct in concluding that 7 CMC § 3401 and § 558 of the Restatement (Second) of Torts (hereinafter "Restatement") created a cause of action for defamation in the Northern Mariana Islands (NMI).

2. Was the trial court correct in ruling that 7 CMC §3401 and Restatement § 611 provided a defense to the cause of action of defamation.

(i) Does the First Amendment of the United States Constitution apply of its own force as "written law" controlling on the Government of the Northern Mariana Islands in the application

---

[7] "In all proceedings, the rules of the common law, as expressed in the Restatement of Law approved by the American Law Institute and, to the extent no so expressed s(sic) generally understood and applied in the United States, shall be the rules of decision in the courts of the Commonwealth, in the absence of written or local customary law to the contrary; provided, that no person shall be subject to criminal prosecution except under the written law of the Commonwealth."

and interpretation of its defamation laws?[8]

(ii) If the First Amendment does not apply of its own force to the Government of the Northern Mariana Islands, what is the scope and meaning of section 501 of the Covenant?[9]

3. Should the decision of the Superior Court be sustained?

## II. ANALYSIS

A. The Court below properly concluded that 7 CMC § 3401 and §588 of the Restatement create a cause of action for defamation in the Northern Mariana Islands.

The Court below based its decision on the application of 7 CMC §3401 and the resulting incorporation of the Restatement as the law creating a cause of action for defamation. We must decide whether the trial court properly applied 7 CMC §3401.

7 CMC §3401 is based on 1 TTC 103, which states:

---

[8] This case also involves section 2 of the NMI Constitution as discussed in the opinion of Justice Villagomez. However, since section 501 of the Covenant and Constitution came into effect on the same day, January 9, 1978, (See, Pres. Proclamation 4534 both approved by People of the NMI and the United States) I view both as having the same meaning.

[9] The Covenant to establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America is a self-executing agreement between the people of the Northern Mariana Islands and the United States. The Agreement was negotiated by a representative of the President and the Northern Mariana Islands Political Status Commission. The Agreement was approved by the people of the Northern Mariana Islands in a plebiscite. Congress approved the Agreement in House Joint Resolution 549, codified as Public Law 94-241. See generally, McKibben, The Political Relationship Between the United States and Pacific islands Entities: The Path to Self-Government in the Northern Mariana Islands, Palau, and Guam, 31 Harv. In. Law J. 257.

"The rules of common law as expressed in the Restatement of Law approved by the American Law Institute and, to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the Courts of the Trust Territory in applicable cases, in absence of written law applicable under section 101 of this Chapter ...."

1 TTC 103 became applicable in the NMI pursuant to section 505 of the Covenant and the Commonwealth Constitution Schedule on Transitional Matters, section 2.[10] The primary law existing on the effective date of the Constitution was the law of the Trust Territory which would, under the foregoing provisions continue to be applicable until changed by the NMI Government. The Analysis of the Constitution, at page 194, states:

"This section provides that laws in force in the Northern Mariana Islands on the day preceding the effective date of the Constitution that are consistent with the Constitution and the Covenant continue in force until they expire or are amended or repealed. This section does not purport to cover laws beyond the reach of Commonwealth authority such as the Trusteeship Agreement, United States laws or Secretarial Orders.

The laws that continue in effect under this section include the Trust Territory Code, the Mariana Islands District Code, and any ordinances and other rules enacted by municipal councils on Rota, Saipan and Tinian."

The purpose of 1 TTC 103 was not to make laws of a foreign jurisdiction applicable as a substitute for laws of the Trust Territory but, rather, to provide substantive law absent "written

_____

[10] Section 2 provides that "[1] laws in force in the Northern Mariana Islands on the day preceding the effective date of the Constitution that are consistent with the Constitution and the Covenant shall continue in force until they expire or are amended or repealed."

247

law" covering the given subject.

1 TTC 103 adopts the law found in the Restatement. The adoption of the Trust Territory Code §103 is an adoption of a specific statute.[11] However, the Trust Territory Code section 103 does not expressly adopt a specific statute but adopts the Restatement in its entirety. Here, a body of law rather than specific laws[12] are made applicable by reference. When a court is called upon to apply and pick and choose from such a large body of laws it in fact legislates, a function which is traditionally reserved to the people or the legislature. Thus, I believe we should construe such statutes narrowly. I would construe 7 CMC § 3401 as applying if the court determines there is no "written law" in the Northern Mariana Islands applying to the subject matter of the case and controversy at issue. This ruling would not prohibit the court from looking to the law of other jurisdictions in the process of interpreting "written law" but the court could not apply as substantive law 7 CMC § 3401 where "written law" exists.

The trial court concluded there was no written law creating a cause of action for defamation and no written law providing

_____

[11] When a specific statute or law of another jurisdiction is adopted by the Northern Marianas and the reference is express and specific in that it refers to one or more named provisions of another act or to one or more named acts, its construction and application is as straight forward as applying an act of the Northern Marianas Legislature.

[12] The Covenant itself has a substantial body of law by reference. See sections 401, 402(b), 403(c), 403(a), 403(b), 501, 502, 503, 505, 506, 601, and 606.

defenses to defamation. We independently researched and found that 7 CMC §2411, Covenant section 501, the First Amendment to the United States Constitution, the Constitution of the Commonwealth of the Northern Mariana Islands, Article I, sections 2 and 10[13] all deal with "written defamation or defenses to defamation." However, none of the above provisions _expressly_ creates a cause of action for defamation. Thus, the court below correctly looked to the Restatement and was correct in concluding that the Restatement created a cause of action for defamation. The court below found a cause of action by looking to section 558 of the Restatement. However, it is not section 558 alone but the sections 558 through 581A in the Restatement dealing with defamation which creates and defines the cause of action. The particular section of the Restatement applicable depends on the particular circumstances of the case. Although Restatement section 558 generally lays out the elements of a cause of action for defamation, it does not define those elements. Definitions are found in other sections of the Restatement (see, e.g. section 580B). Thus, the issue arises of what is to be done when "written law" exists concerning some of the

---

[13] The existence of a cause of action for defamation is acknowledged in the Analysis of Article I, section 2 of the Commonwealth Constitution:

> This provision does not affect the availability of a cause of action for slander where the speech is false, injurious to reputation and meets the other legal requirements.

Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands, pg. 5.

249

elements of a cause of action or defense to a cause of action but not others. In this instance, the Restatement would apply to those elements not otherwise addressed by "written law." For these latter elements, the written law would apply. Therefore, the court may only apply the Restatement as substantive law on <u>a particular element</u> of a cause of action where there is no "written law" on that element or issue unless the court finds such application of "written law" would lead to a result totally inconsistent with basic cause of action itself or would lead to an absurd result. Taking this rule and applying to this case, I will deal with the court's application of section 611 of the Restatement.

B. ▪ The court below erred in finding that section 611 of the Restatement provides a defense for defendant herein since there exists, under the laws of the Commonwealth, written law establishing defenses to defamation actions. The applicable written law is Covenant section 501 and its incorporation of the First Amendment to the United States Constitution.

 (i) Does the First Amendment to the United States Constitution apply of its own force to govern the Government of the Northern Mariana Islands in the application and interpretation of its defamation laws.

To determine whether the First Amendment of the United States Constitution is a "written law" within the meaning of 7 CMC § 3401, we must determine the applicability of the First Amendment to the Government of the Northern Mariana Islands.

We begin the inquiry by looking to the Constitution itself. The First Amendment states that Congress shall not abridge freedom of speech. The Supreme Court has held that the first ten

250

Amendments to the United States Constitution do not vest rights in individuals against all governments but only the United States Government. Mr. Justice Marshall in <u>Barron v. The Mayor and City Council of Baltimore</u>, 8 L.Ed. 672, 674, 32 U.S. 243 (1833), held that protections against the state governments were left to the people of each of the states and that each state was free to fashion their own bill of rights. If the first Ten Amendments including the First Amendment inherently, or of their own force, apply **only** to the Government of the United States, then is there any other provision of the Constitution that makes them applicable to the governments other than the United States? The most obvious is the Fourteenth Amendment. The First Amendment has been applied to the states via the Fourteenth Amendment. <u>Cantwell v. Connecticut</u>, 310 U.S. 296 (1940). The issue now becomes whether the Government of the Northern Mariana Islands is a state within the meaning of the Fourteenth Amendment to the United States Constitution. This inquiry requires analysis of the relationship between the Northern Mariana Islands and the United States.

We begin with the most obvious: citizens and residents of the Northern Mariana Islands, unlike citizens of several states do not <u>vote</u> for nor are they <u>represented</u> by members in the United States House of Representatives or Senate. The Northern Mariana Islands did not enter into a political union with the United States on "equal footing"[14] with any state.[15] I <u>conclude that the Northern</u>

---

[14] Equal footing is a constitutional requirement of admission to the Union. <u>See</u> <u>Mumford v.Wardwell</u>, 73 U.S. 423 18 L.Ed. 756.

Mariana Islands is not a State within the meaning of the Fourteenth Amendment.[16] However, that conclusion is not the end of the inquiry.

As shown above, the Government of the Northern Mariana Islands is not the federal government and is not a state government. However, the issue arises as to whether the Northern Marianas is an instrumentality of either of the foregoing governments. The United States Constitution has been made applicable to instrumentalities of both the Federal and State Government.[17] To determine if the Northern Mariana Government is such an instrumentality, we must analyze the extent of authority retained by the Northern Marianas pursuant to section 103 of the Covenant. Does the federal government have sufficient authority to control the internal affairs of the Northern Mariana Islands to characterize the Commonwealth as an instrumentality.[18]

---

[15] As will be shown below, express provisions of the Covenant demonstrate that the Northern Mariana Islands cannot be viewed as a state or identical to a state. See Covenant, Article II, sections 501 and 805 for example.

[16] See also cases involving Indian Tribe Governments, Santa Clara Pueblo v. Martinez, 346 U.S. 49 (1978), Board of Commissioner v. Seber, 318 U.S. 705 (1943), Native American Church of North America v. Navajo Tribal Council, 272 F.2d 131 (10th Cir. 1959).

[17] See Baldwin v. New York, 399 U.S. 66 (1970), Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), Duncan v. Louisiana, 391 U.S. 145 (1968).

[18] If Congress had plenary power, the NMI would clearly be an instrumentality. See Ngiraingas v. Sanchez, 1990 U.S.W.L. 48272 (U.S.) and 858 F.2 at 1361, Fn. 1.

For a historical perspective of the political union between the NMI and the United States, we refer to the Final Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States, pages 1-12.[19]

The Northern Mariana Islands was part of a Class C mandate to Japan before World War II as a result of Japan's victory over Germany in 1914.[20] The United States defeated Japan in World War II and occupied the Northern Mariana Islands.

In 1945, the United States entered into the United Nations Charter, a treaty approved by the Senate of the United States. In that treaty, 16 of 105 articles deal with trusteeships. The Northern Mariana Islands became part of a United Nations Trusteeship under Article 83 of the U.N. Charter. Strategic trusteeships were under the auspicious of the Security Council where the United States had a veto rather than the General Assembly in which it did not.

The United States, by conquering Japan rather than the Northern Mariana Islands, inherited only what Japan had, a trust --

---

[19] The Federal Laws Commission is a commission authorized by the Covenant whose members are appointed by the President of the United States. That Commission is to make "recommendations to the United States Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner, and which applicable laws should be made inapplicable and to what extent and what manner." Covenant, section 504.

[20] In 1919 the League of Nations gave the Class C Mandate to Japan. See League of Nations Covenant, art. 22; Comment, International Law and Dependent Territories: The Case for Micronesia, 50 Temp.LQ. 58, 70-71.

not sovereignty by conquest. Even if the United States had "conquered" the people of the Northern Mariana Islands, it relinquished that "spoil of war" by entering into an agreement with the Security Council of the United Nations. That agreement took the form of an executive agreement with the approval of both houses of Congress,[21] was approved by the United Nations Security Council and entered into by the United Nations Treaty Service.[22] This Agreement required the United States, as Administering Authority of the United Nations Trusteeship, "to promote self-government or independence" – thereby following the requirements of the United Nations Charter. Since neither the United States nor the United Nations could unilaterally modify the Charter or the Trusteeship Agreement, this requirement of self-government or independence must, of necessity, guide the interpretations of future documents and the present political union between the Northern Mariana

---

[21] Exec. Order No. 9875, 3 C.F.R. 658 (1947); H.R.J. Res. 233, passed on July 18, 1947 as P.L. 204, 80 Cong., 1st Sess. This agreement was entered to carry out the United Nations Charter, a treaty ratified by the United States Senate pursuant to Art. 1 Sec. 8 Cl. 18 of the Constitution (the "Necessary and Proper" Clause). See also, Juda v. United States:

> The United States had not administered the Trust Territory under the authority conferred in Article IV, section 3, concerning regulation by Congress of territories or other property belonging to the United States. 6 Cl.Ct. 441, 456 (1985).

[22] Trusteeship Agreement for the Former Japanese Mandated Islands, approved by the U.N. Security Council, April 2, 1947, and by the United States, July 18, 1947, 61 Stat. 3301, T.I.A.S. See also State Department Bulletin, No. 135.

Islands and the United States.[23] See generally Sutherland Stat.Const., section 51.0, 51.02 (4th ed.) In particulars, in section 51.02 at page 454, we find:

> Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense.

Without the Charter and the Trusteeship Agreement's requirement of "self-government or independence", the fears expressed by Mr. Justice Harlan in his dissenting opinion in Hawaii v. Mankichi, 190 U.S. 197, 240 91903) would have been realized:

> If the principles now announced should become firmly established, the time may not be far distant when, under the exaction of trade and commerce, and to gratify an ambition to become the dominant political power in all the earth, the United States will acquire territories in every direction, which are inhabited by human beings, over which territories, to be called 'dependencies' or 'outlying possessions,' we will exercise absolute dominion, and those inhabitants will be regarded as 'subjects' or dependent peoples,' to be controlled as Congress may see fit, not as the Constitution requires, nor as **the people governed may wish.** This will be engrafted upon our republican institutions, controlled by the supreme law of a written constitution, a **colonial** system entirety foreign to the genius of our Government and adherent to the principles that underlie and pervade the constitution.[24]

Under the authority of the United Nations, the Marianans began

---

[23] See Concurring Opinion in CNMI v. Bordallo, No 90-003, (NMI June 9, 1990).

[24] This is the very evil that the Charter and Trusteeship were intended to eliminate and avoid.

discussions to create a political union with the United States consistent with the United Nations Charter and Trusteeship.[25] After concluding negotiations with a representative of the President of the United States, the Covenant was presented to the people of the Northern Mariana Islands.

A plain reading of the Covenant reveals one basic theme, the reservation of "self-government" in the people of the Northern Mariana Islands. A plain reading the United Nations Charter and Trusteeship demonstrates but one overriding purpose: to promote "self-government" and avoid "colonies".[26]

Section 101 creates a political union and the definition and terms of that political union are set forth in the following ten

---

[25] See *Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* of the Marianas Political Status Commission, February 15, 1975, at page 3.

> .... the first clause notes that under the Charter of the United Nations and under the Trusteeship Agreement itself, the people of the Northern Marianas are **guaranteed** the right freely to express their wishes for **self-government** or independence (Colonial status was not an alternative) the third clause emphasizes that the people of the Northern Marianas and the people of the United States share the goals and values found in the American system of government based on the principles of **government by consent, individual freedom and democracy.**

> ....the clause then states the essential purposes of the Covenant: 'to establish a **self-governing Commonwealth** for the Northern Mariana Islands within the American political system and to **define** the relationship ... neither side will be able to **alter it in any fundamental** respect without the consent of the other.

[26] See the Political Relationship Between the United States and the Pacific Island Entities, the Path to Self Government in the Northern Mariana Islands, Palau, and Guam: *supra*.

Articles. The basic terms are in sections 102, 103, and 104. These three sections provide guidelines that help define the union. Section 102 provides that the Covenant and the laws incorporated by reference therein are the "supreme" law of the relationship between the Northern Mariana Islands and the United States. Section 103 basically reserves to the People of the Northern Mariana Islands the right on "self-government" while section 104 grants to the United States control over foreign affairs and defense. The remainder of the Covenant, with a few exceptions,[27] carries out this theme. Nowhere is the breadth of this reserved right of "self-government" more apparent than in section 501. This section incorporates by reference certain parts of the United States Constitution applicable to the Government of the Northern Mariana Islands, then provides that:

"Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands will be applicable only with the approval of the Government of the Northern Mariana Islands and of the Government of the United States."

Section 103, when read in conjunction with section 501, demonstrates the unique political relationship created by the Covenant. The Northern Mariana Islands is the only participant in a political union with the United States which has to consent to

[27] See Section 2 of Amendments 13, 15, 19, and 26 of the United States Constitution incorporated by reference in section 501 of the Covenant. See also Covenant sections 502(b), 503, 604, and 606(b) for other examples.

257

application or incorporation of provisions and amendments to the United States Constitution before they become effective.[28] In contrast, the state and federal governments are bound by amendments the minute they become effective.[29] If the Northern Mariana Islands were a state under the Fourteenth Amendment, this important fundamental provision would clearly be invalid.

Another example of the unique Covenant relationship is the manner in which the Northern Marianas Senate is elected. Unlike the states, the NMI elects a Senate which is not based upon the fundamental right of one man one vote. Such an election scheme in a state would be unconstitutional. See Reynolds v. Sims, 377 U.S. 533. The fact that such an electoral scheme can exist in the NMI demonstrates the reservation of "self-government" over local and internal affairs in the people of the NMI without federal interference.

The right of "self-government" free from federal interference precludes the Northern Mariana Islands from being considered an

---

[28] The fact that the highest and most basic of all laws, the U.S. Constitution, must be consented to before being incorporated by reference or made directly applicable to the NMI supports the conclusion that "lesser" laws such as federal statutes and regulations infringing on "self-government" also requires consent by the people themselves or their elected representatives before being effective. The mechanism for consenting or resolving differences is Covenant section 902.

[29] It should be noted that states have two voices in approving Constitutional amendments other than by convention. First, their elected house and senate members vote on the amendment and then the state legislatures ratify them. The people of the Northern Mariana Islands have no vote in the United States House or Senate, nor does their legislature "ratify" Constitutional amendments.

instrumentality of the Federal Government.[30] That the people of the Northern Mariana Islands never granted the United States any authority[31] with respect to internal self-government makes this political union unique. Self-government over internal matters was retained by the people of the Commonwealth and not granted the United States as of 1978, the effective date of section 103. The political union and any permanent authority of the United States under section 101 and 104 came in 1986.[32] The United States was granted only what the people of the Northern Mariana did not retain.

The concept of self-government has been criticized because the Covenant lacks a precise definition of that term. However, the lack of a definition should not be grounds for ignoring the intent and purpose of the Covenant to create a self-governing Commonwealth

---

[30] The Government of the Northern Mariana Islands is not the Federal Government or a state government and is not an instrumentality of either; thus no provision of the Constitution would be applicable to the Government of the Northern Mariana Islands "of its own force." The Constitution in its fundamental respects would, however, be applicable to all federal officials and federal action in the Northern Mariana Islands "of its own force." Where the Government of the Northern Mariana Islands is acting on behalf of the United States Government in carrying out Federal Programs, an issue of being an instrumentality arises regarding that particular conduct.

[31] As noted earlier, certain laws of the United States have been incorporated by reference by the Covenant and been adopted by the people of the Northern Mariana Islands.

[32] See Political Relationship Between the United States and Pacific Island Entities: The Path to Self-Government in the Northern Mariana Islands, 31 Har.ILJ 257, 276, supra.

in political union with the United States, as required by the United Nations Charter and agreements made thereunder.[33] What of the definition of due process, freedom of speech or religion? Courts have found ways to provide definitions of these terms. "Self-government" is no different. I have noted that the Covenant in section 104 tells us that matters involving foreign affairs and defense are not matters involving self-government. What then is self-government? Or said another way, what authority did the people reserve and not grant to the United States?

The analysis begins by noting that section 103 reserves to the

---

[33] See Sutherland, <u>Stat. Const.</u>, section 45.10:d (although the Covenant is an agreement and not technically a statute, we can be guided by basic principles of statutory construction).

The determination of a case at common law depends not only upon the decision in a prior case but upon the whole pattern or previous decisions .... A practitioner is seldom willing to base his entire case on one prior decision. He usually considers the position of that decision as part of the whole pattern of decisions in the case-law field.

A similar approach is utilized in the field of statutes. The common view is that: it seems scarcely appropriate to apply the term; law, to that which was one thing yesterday, another today, and still another tomorrow....

...(A)n examination of all legislation in a particular field is necessary for a full appreciation of any specific enactment. This consideration must be more inclusive than the literal inquire of in pari materia; it must probe basic policy and the pattern and development of the means and procedures used to activate that policy. An inquiry of this character can disclose a legislative common law of surprising consistency and continuity. It not only may give meaning to the "legislative intent" of a particular statute but can also pave the way for constructive judicial use of legislative as well as case law precedents.

people (not the government) of the Northern Mariana Islands the right of "self-government". The people govern themselves chiefly by exercising their voting rights. Accordingly, I conclude that "self-government" and the right to vote go in hand-in-hand. The United States Supreme Court has provided a definition of the right to vote which can also serve as a starting point for the definition of the right of "self-government." Justice Warren in <u>Kramer v. Union Free School District No. 15</u>, 395 U.S. 621 (1969) found that the plaintiff's right to vote was infringed because he was not allowed to participate in an election that involved matters he was substantially interested in and which substantially affected him. I, therefore, define self-government as the right to vote on matters in which NMI voters are substantially interested and which substantially affect them. Since NMI voters do not participate in Federal elections, self-government must confer legislative authority in the persons they do vote for, the NMI Government.

In light of the Covenant's grant to the United States of authority over foreign affairs and defense in section 104, I find that section 103 reserved to the people of the Northern Mariana Islands authority over all internal matters in which the inhabitants are substantially interested and which substantially affects them, so long as it does not primarily involve foreign affairs or defense.[34] I further find that since the United States

---

[34] The Covenant has a few specific exceptions to this rule. The Covenant also allows Congress to make applicable:

> (a) except as otherwise provided in section 506, the immigration and naturalization laws of the United

has no authority over matters of "self-government" as defined, I conclude that the Government of the Northern Mariana Islands is not an instrumentality of or substantially controlled by the Government of the United States. The First Amendment does not apply of its own force to the Government of the Northern Mariana Islands.

Independent grounds exist to preserve the right of "self-government" to the people of the Northern Mariana Islands precluding NMI from being an instrumentality. The right of "self-government," defined as the right to elect those persons who govern, is so fundamental that it constitutes a preemptory norm of international law or jus cogens from which no derogation is permitted whether by treaty or domestic legislation. See generally, Committee of U.S. Citizens in Nicaragua v. Reagan, 859 F.2d 929, 939, 940 (D.C. Cir. 1988). See also, Jus Cogens: Compelling the Law of Human Rights, 12 Hastings Int'l and Comparative Law Review, 411 (1989). The application of the doctrine of jus cogen to protect the right of "self-government" is particularly appropriate in the CNMI. As part of the Trusteeship,

---

States;

 (b) except as otherwise provided in subsection (b) of section 502, the coastwise laws of the United States and any prohibition in the laws of the United States against foreign vessels landing fish or unfinished fish products in the United States; and

 (c) the minimum wage provisions of section 6, Act of June 25, 1938, 52 Stat, 1062, as amended.

See also, Covenant section 501 incorporated by reference, the 13th, 15th, 19th, and 26th amendments legislative power.

262

the NMI was afforded all the fundamental freedoms adopted by the United Nations including Article 7 (equal protection) and Article 21 (the right to participate in government through freely chosen representatives) of The International Bill of Human Rights and the United Nations Charter. The Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A (III), U.N. Doc. A/810 at 71 (1948). Article 7 and Article 21 are preemptory norms of international law and the application of federal law in derogation of "self-government" would violate such peremptory norms.

Therefore, in the present case, the NMI being neither the Federal nor State government and not being an instrumentality of either, the First Amendment to the United States Constitution is not "written law" within the meaning of 7 CMC § 3401.

I am aware that this conclusion is at odds with the reasoning of United States of America v. Juan M. Sablan, No. 89-0008 (D.NMI 1989). In that case, the court observed:

Covenant section 105[35] explicitly provides that the

---

[35] The Court in Sablan fails to understand the role and purpose of section 105 of the Covenant. The role of this section is to provide the "power" to legislate in light of the fact that section 501 did not make applicable the Necessary and Proper Clause, the Territorial Clause, or the Interstate Commerce Clause, (the primary provisions which authorize Congress to enact

legislation. The Covenant, however, does incorporate the limited legislative powers to carry out the 13th, 15th, 19th, and 26th Amendments as section 2 of those amendments are incorporated by reference). Section 105 authorizes Congress to legislate in the Northern Mariana Islands to carry out its rights and obligations under the Covenant.

'United States may enter legislation in accordance with its <u>constitutional processes which will be applicable</u> to the Northern Mariana Islands.' The <u>only</u> (emphasis added) restriction on this right is that if such legislation is not applicable to the several states, the NMI 'must be specifically named in the legislation for it to become effective here. It was clearly intended by both governments in section 105 that <u>every</u> (emphasis in original) law would apply to the Commonwealth if the law was applicable 'to the several states." .... All federal laws applicable to the several states will automatically apply in the CNMI. Moreover, the U.S. Congress can go further and make applicable to the CNMI federal laws which it could not make applicable to the several states. (Footnote added.)

If the above were true the Covenant would become a treaty of cession.[36] This is the manner in which the United States obtained most of its territories. If the Northern Mariana Islands was intended to be such a territory, the Covenant would have but two operable provisions (sections 101 and 105). The rest of the document and the provisions therein would be rendered meaningless.

---

The Necessary and Proper Clause of the United States Constitution provides a similar function as providing for legislative powers in carrying out the United States Constitution.

Section 104 grants the United States authority over foreign affairs and defense, section 104 does not authorize enacting legislation. It is section 105 which authorizes the United States to enact legislation to carry out its authority in section 104 or other provisions of the Covenant.

[36] In the Treaty of Peace (Treaty of Paris of 1898), 30 Stat. 1754, T.S. No. 343, Spain ceded Puerto Rico and Guam to the U.S.

The Virgin Islands were ceded to the U.S. by the King of Denmark in the Treaty for Cession of Danish West Indies. Aug. 4, 1916, 1706, T.S. No. 369.

In the case of American Samoa, the island chiefs ceded the territory to the U.S. in two separate documents, the Treaty of Cession of Tutuilla and Aunuu, April 17, 1900, and the Treaty of the Cession of Manu'a Islands, July 16, 1904.

What would become of section 501 of the Covenant which states "Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with the approval of the Government of the Northern Marina Islands and the Government of the United States." (Emphasis added.)[37]

If the Sablan decision is correct, why does the Covenant provide rights to the United States pursuant to Section 104? What is the role and purpose of section 502 and its phrase "and amendments thereto" if Congress already had that power pursuant to section 105? Why the need for section 503 giving the Congress the right to enact and make applicable United States immigration laws? What purpose does section 604(a) serve by granting Congress the power to levy excise taxes on goods manufactured, sold or used or services rendered in the Northern Mariana Islands serve if the Sablan interpretation of section 105 is correct? If section 105 is to be read as expansively as the Sablan court believes there is only one significant section to the Covenant, section 105. Obviously, the drafters of the Covenant intended to give meaning to

---

[37] See Sutherland Stat. Const., section 46.06:

"It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." As statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.

the document in its entirety and the Covenant must be read and interpreted as a whole.[38]

The _Sablan_ court rhetorically asks "What, then is to be made of the guarantee of 'self-government' found in Covenant section 103?" The answer given by the court seems to conclude this right is no more than a right to elect a meaningless government whose legislation another legislature (the federal government) can invalidate or supplement; and this is possible without giving the inhabitants of the NMI a vote for the federal officers who would control the lives of NMI residents.[39] The _Sablan_ court views the

---

[38] The _Sablan_ court reaches its result by ignoring the "statutory" history and purpose of the Covenant in carrying out the Charter and Trusteeship agreement! The _Sablan_ court ignores the plain meaning of sections 103 and 104 reserving "self-government" and granting authority over foreign affairs and defense. To justify its position, the _Sablan_ court states that by voting for the Covenant, the people of the NMI ratified the language of the Covenant as interpreted by the _Sablan_ court. This justification defies a reasonable interpretation of what the people of the NMI believed the Covenant stated. After voting for "self-government" in section 103,, what reasonable person would conclude that section 501 language stating "of its own force" meant the United States had unfettered authority to legislate in the NMI by virtue of the Territorial Clause, article 4, § 3, clause 2? Such authority is the anti-thesis of "self-government" and would constitute deception of the highest order.

[39] The idea that the unelected federal legislature could enact legislation which affects the day to day lives of the inhabitants does violence to the United States Constitution as laid out in _Kramer_ (supra) as a violation of the right to vote. See Sutherland Stat. Const., section 45.11:

> As a corollary of favoring constitutionality, the fact that one among alternative constructions would involve serious constitutional difficulties is a reason to reject that interpretation in favor of another. It has even been said that "strained construction" is not only permissible, but desirable, if it is the only

NMI as nothing more than a territory of the United States, a view that has no historical basis,[40] no legal basis[41] and no basis under the Covenant.

I conclude the right of "self-government" pursuant to the Covenant section 103 clearly establishes that the Government of the Northern Mariana Islands is not an instrumentality of the federal government and as such the Constitution of the United States is not applicable of its own force and is not "written law" within the meaning of 7 CMC § 3401.

---

construction that will save constitutionality.

[40] The United Nations Charter and Trusteeship Agreements (the predecessor treaties to the Covenant) primary purpose was to avoid such a result. The only "history" for supporting the Sablan interpretation appears in the "approval" process long after the Covenant was signed.

[41] See Ngiraingas v. Sanchez, 849 F.2d 372 (1989) at 375 fn. 1: (affirm in Ngiraingas v. Sanchez, 1990 U.S.W.L. 48272 (U.S.).

> Guam's relationship with the United States Government distinguishes this case from Fleming v. Department of Public Safety, 837 F.2d 401 (9th Cir. 1988) ... CNMI has a unique relationship with the United States; the original Trusteeship Agreement obligated the United States to "promote the development of the inhabitants of the Trust Territory toward self-government or independence," see Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, art. 6, section 1, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189, quoted in Fleming, at 403. Significantly, the "United States does not possess sovereignty over the Trust Territory" but merely "exercises powers of administration, legislation and jurisdiction ... pursuant to an agreement with the United Nations." (citations) Guam's relationship to the United States is sovereign status; unlike CNMI, it "is subject to the plenary power of Congress and has no inherent right to govern itself ...." (Emphasis added.)

ii. If the First Amendment does not apply of its own force, as a restriction on the Government of the NMI, are the principles of that Amendment incorporated - by reference into section 501 of the Covenant, which is a written law in the NMI, precluding the application of the Restatement as a defense to defamation?

Having found First Amendment does not apply of its own force to the Government of the Northern Mariana Islands, what is the function of Covenant section 501? Section 501, like 7 CMC § 3401, incorporates into the law of the NMI the law of another jurisdiction. I conclude section 501 incorporates by reference the terms and principles of the First Amendment. Having concluded section 501 incorporates by reference the First Amendment, the remaining issue concerns whether judicial interpretations by United States courts of that Amendment occurring subsequent to January 9, 1978 are to be followed.[42] Or, said another way, are the interpretations given by the United States Courts binding on this Court?

Covenant section 501 incorporates by reference the First Amendment of the United States Constitution. The section further provides:

> Other provisions of or amendments to the Constitution of the United States which do not apply of their own force

---

[42] See Sutherland Stat.Const. section 51.0-8 at 516:

A statute of specific reference incorporates the provisions from the statutes referred to at the time of adoption without subsequent amendments.

The same logic would follow regarding Judicial Interpretations.

268

within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with the approval of the Government of the Northern Mariana Islands and of the Government of the United States.

The theme of section 501 is that the provisions of the Constitution made applicable by section 501 were known and approved at the time the Covenant was voted on and any subsequent amendment or other change must be consented to by the Government of the Northern Mariana Islands. This is consistent with the basic purpose of the Covenant which is to create a political union preserving self-government in the people of the Northern Mariana Islands. Is self-government better served by the Federal Courts determining the meaning of section 501's application to the Northern Mariana Islands, or is self-government better served by having this Court determine the meaning of section 501?[43] Self-government is defined above in the context of what laws apply to the Northern Mariana Islands. An analysis of the role of this Court and its relationship with the federal courts is necessary to determine the appropriate forum for deciding the application of section 501 of the Covenant to this case.

The federal courts are granted final authority over state courts because of the Supremacy Clause of the United States Constitution and the application of Article III of the United

---

[43] As noted earlier, the primary purpose of the Charter, Trusteeship Agreement and Covenant was to preserve self-government and avoid colonialism. Therefore, the document must be construed to carry out this clear purpose. See Argosy Limited v. Hennigan, 404 FR.2d 14 at 20 (1968).

States Constitution. Article III grants the Supreme Court jurisdiction to decide all "Cases" arising under this Constitution, [and] the Laws of the United States." Ableman v. Booth, 16 L.Ed. 169 (1859).

Article III and the Supremacy Clause[44] of the United States Constitution (including the provision "and the Judges in every states shall be bound thereby,") do not apply in the NMI and do not govern the relationship between the Northern Mariana Islands and the United States. See section 501. These provisions grant the federal courts final authority over state courts. In lieu of the Supremacy Clause, Covenant section 102 provides:

> The relations between the Northern Mariana Island and the United States will be governed by this Covenant which, together with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands will be the supreme law of the Northern Mariana Islands.

The Covenant's "supremacy clause" does not contain the "judicial supremacy" section of the U.S. Constitutional's supremacy

---

[44] The Supremacy Clause (Article VI) of the United States Constitution is not made applicable to the Northern Marianas.

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. (Emphasis added.)

clause. The unique relationship created by the Covenant,[45] whereby the people of the Northern Mariana Islands retained authority over local and internal matters in section 103 and granted the United States authority over foreign affairs and defense in section 104 precludes either judiciary from controlling the other.[46] The Covenant limits the legislative powers of the United States to legislation that does not violate "self-government."[47] Covenant section 501 does not incorporate the Necessary and Proper Clause, Territorial Clause or the Interstate Commerce Clause of the United States Constitution. Those clauses are the primary constitutional powers authorizing Congress to legislate in states and territories. In lieu of incorporating by reference these powers[48] found in the United States Constitution, the Covenant has section 105 which provides:

---

[45] One aspect of this uniqueness is the lack of representation the people of the Northern Mariana Islands have in the federal decision making. The inhabitants of the Northern Mariana Islands have no vote in the executive or legislative branches of government which appoint and confirm members of the judiciary.

[46] If differences in judicial opinions occur, the Covenant has section 902. These differences can be resolved pursuant to Covenant section 902.

[47] See section 105 of the Covenant.

[48] The Covenant *does* incorporate by reference the *legislative power of Congress* to enforce the 13th, 15th, 19th, and 26th Amendments. Thus, in addition to the powers of section 105 to in effect pass any legislation necessary and proper to carry out the Covenant, Congress can pass legislation to carry out those enumerated Constitutional powers *even if they* otherwise involve matters of self-government.

The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands ... In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

Therefore, in light of the absence of these powers, any legislation governing the relationship between the courts of the Northern Mariana Islands and the courts of the United States found in section 403(c) is limited by section 105's restriction against any legislation restricting or modifying "self-government." The Covenant is not embodied within the meaning of the phrase "cases involving the Constitution, treaties, or laws of the United States." In section 403. Sections 102, 202, 1004, and 903 all deal one way or another with the Covenant and/or Constitution, treaties, or laws of the United States. Every place those terms appear, it is clear that the Covenant has a separate and distinct meaning. In section 102, we find:

The relations between the Northern Mariana Islands and the United States will be governed by this Covenant which, together with those provisions of the Constitution, treaties, and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands.

In section 204, we find:

... the courts established by the Constitution or laws of the United States will be competent to determine whether the Constitution and subsequent amendments thereto are consistent with this Covenant and with those provisions

of the Constitution, treaties, and laws of the United States applicable to the Northern Mariana Islands.

In section 1004, the President of the United States can suspend "the application of any provision of the Constitution or laws of the United States which would otherwise apply...."

In section 902, the Covenant is specifically dealt with. Thus, it is clear that when the Covenant is involved, it specifically appears and is not subsumed within the Constitution, treaties, or laws of the United States. Its omission in 403 is consistent with the theme of the Covenant leaving all matters of self-government to the people of the Northern Mariana Islands and the government they established in Article II.

In light of the above, I am of the opinion that this court as a matter of self-government determines the application of section 501 to this case.

The courts in the United States have applied the First Amendment for over 200 years to many fact situations, I am persuaded that we should interpret section 501 as incorporating no less First Amendment protection to the press than that provided by the First Amendment as construed by the courts of the United States. Time, Inc. v. Firestone, 47 L.Ed. 2d 154 (1976) presents a fact situation similar to this case. In the plurality decision authored by Justice Rehnquist (with concurring opinions of Justices Powell and Stewart), the court considered under what conditions a publisher would be liable to a private plaintiff.

In that case the defendant, a publisher (Time magazine);

273

reported in its "Milestone" section:

> "Divorced. By Russel A. Firestone Jr., 41, heir to the
> tire fortune: Mary Alice Sullivan Firestone, 32, his
> third wife; a onetime Palm Beach schoolteacher; on
> grounds of extreme cruelty and adultery; after six years
> of marriage, one son; in West Palm Beach, Fla. The 17-
> month intermittent trial produced enough testimony of the
> extra-marital adventures on both sides, said the judge
> 'to make Dr. Freud's hair curl.'"

The Supreme Court of Florida affirmed a judgment against Time. An appeal was taken to the United States Supreme Court on the Time's claim that the judgment violated its First and Fourteenth Amendments rights.

The opinion of Justice Rehnquist upheld the <u>jury</u> finding that the article was false. The court stated:

> For the petitioner's report to have been accurate, the
> divorce granted Russell Firestone must have been based on
> a finding by the divorce court that his wife had
> committed extreme cruelty toward him **and** (emphasis in
> original) that she had been guilty of adultery ... it is
> ...' indisputable that these were not the facts, Russell
> Firestone alleged in his counterclaim that respondent had
> been guilty of adultery, but the divorce court never made
> any such finding. Its judgment provided that Russell
> Firestone's "counterclaim for divorce be and the same is
> hereby granted," but did not specify that the basis for
> the judgment was either of the two grounds alleged in the
> counterclaim. The Supreme Court of Florida on appeal
> concluded that the ground actually relied upon the
> divorce court was: lack of domestication of the parties,"
> <u>a ground not theretofore recognized by Florida law</u>.
> (underlying added.) The Supreme Court nonetheless
> affirmed the judgement dissolving the bonds of matrimony
> because the record contained sufficient evidence to
> establish the ground of extreme cruelty.
>
> (Time) may well argue that the meaning of the trial

274

court's decree was unclear[49] but this does not license it to choose from among several conceivable interpretations the one most damaging to respondent. Having chosen to follow this tack, petitioner must be able to establish not merely that the item reported was a conceivable or plausible interpretation of the decree, but that the item was factually correct. We believe there is ample support for the jury's conclusion, affirmed by the Supreme Court of Florida, that this was not the case.

The Court then stated that two other criteria must be shown. First, there must be a showing of fault and second, that compensatory awards "be supported by competent evidence concerning injury." The Court reversed and remanded for a finding on the issue of fault.

## 3. The Court below properly granted Summary Judgment.

Adopting the reasoning of Justice Rehnquist, I determine that a publisher cannot be held responsible in damages for publishing a defamation without the plaintiff showing negligence or fault. Taking this rule and applying it to this case, we must determine whether defendants' motion for summary judgment was proper. Having determined the Court improperly applied 7 CMC § 3401, we must determine whether, the record supports the grant of summary judgment under the test articulated today. The facts most favorable to the plaintiff to form the basis of fault are as

---

[49] Citing a footnote in the Opinion:

(Time) is _incorrect_ in arguing that a rational interpretation of an ambiguous document is constitutionally protected under our decision in _Time, Inc. v. Pape_, 28 L.Ed. 2d 45 (1976).

275

follows: The file contained a summons indicating the village in which Pedro T. Borja resided and this was not reported. Reporting the village as a further identification of Pedro T. Borja would make it clear that the plaintiff was not the person convicted.

■ I conclude that under the circumstances of this case, defendant cannot be found to be negligent or otherwise at fault, for reporting an official proceeding as long as the report carries the correct name of the person concerned and was correct in all other respects. There is no duty to further identify the person unless the particular document being reported contains a further identification. The duty to go through the entire file of litigation to identify a person beyond the name given in the particular document being reported, would be such a restraint on the reporting of judicial proceedings that the public would lose the benefit of such reporting. I find, as a matter of law, defendant herein was not at fault for reporting the correct name of the convicted party in the prior criminal judicial proceeding. Based on this ruling, I concur in sustaining the grant of summary judgment.